**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MOHAMED ABDELAL,

        Plaintiff,

              vs.

COMMISSIONER, RAYMOND W. KELLY; CITY
OF NEW YORK,

            Defendants.

Civil Action No. 13-cv-04341
(ALC)(SN)

**AMENDED COMPLAINT**

**JURY TRIAL DEMAND**

Plaintiff Mohamed Abdelal, by his attorneys, Stoll, Glickman, & Bellina, LLP, alleges

upon personal knowledge and upon information and belief to all other matters, as follows:

**NATURE OF ACTION**

1.     Plaintiff Mohamed Abdelal ("Mr. Abdelal" or "Plaintiff") brings this action

against Commissioner, Raymond W. Kelly (the "Commissioner" or "Kelly") and the City of

New York, ("The City", together with Kelly, the "Defendants") for declaratory and monetary

relief and damages for injuries Plaintiff has sustained as a result of Defendants' discrimination

against him based on his religion (Muslim) and national origin (Egyptian national) in violation of

42 U.S.C. § 1981 *et seq.* ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended,

at 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York City Human Rights Law,

Administrative Code § 8-107 *et seq.* ("NYCHRL"), and the New York State Human Rights Law,

N.Y. Executive Law § 290 *et seq.* ("NYSHRL").

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction in this action, pursuant to 28 U.S.C. § 1332(a) as Plaintiff is presently a citizen of New Jersey.  This Court has supplemental jurisdiction over Plaintiff's City and State law claims brought under the NYCHRL and NYSHRL pursuant to 28 U.S.C. § 1367.

3.      Further, the Court has jurisdiction over Plaintiff's claims under Section 1981 and Title VII pursuant to 28 U.S.C. § 1331.

4.      Since Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), the EEOC issued a Notice of Right to Sue, and this action was timely brought within ninety (90) days of the Right to Sue letter Plaintiff has satisfied all statutory prerequisites for filing this action.

5.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      Venue is proper within this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because the unlawful conduct which gives rise to Plaintiff's claims occurred within the Southern District of New York.

7.      Defendants are subject to personal jurisdiction in New York.

**PARTIES**

8.      Plaintiff Mohamed Abdelal was employed by Defendants as a New York City Police Officer from January 2006 through January 29, 2013.

9.      Presently, Plaintiff resides in Jersey City, New Jersey.

10.     At all relevant times mentioned herein, Defendant City of New York is and was a municipal entity created and authorized under the laws of the State of New York. The City is

2

authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which The City is ultimately responsible for.

11.     Defendant City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers.

12.     At all relevant times mentioned herein, Defendant Raymond W. Kelly was the Police Commissioner for the City of New York and was duly appointed and acting as an officer, servant, employee and agent of the New York City Police Department, a municipal agency of Defendant City of New York.

13.     Al all relevant times herein, Defendant Kelly was acting under the color of the laws, statues, ordinances, regulations, policies, customs, and/or usages of the State of New York and the New York City Police Department, in the course and scope of his duties and functions as an officer of Defendant City of New York, and was acting for, and on behalf of, and with the power and authority vested in him by The City and the New York City Police Department, and was otherwise performing and engaging in conduct incidental to the performance of his lawful functions in the course of his duties.

14.     At all relevant times mentioned herein, Defendant Kelly actively and directly participated in the unlawful discriminatory conduct directed against Plaintiff alleged herein by failing to ensure safe and nondiscriminatory working conditions, and ratifying or condoning the conduct alleged herein.

15.     Defendant Kelly is sued in his individual and official capacity.

16.     At all relevant times herein, Defendants met the definition of Plaintiff's "employer" under all applicable statutes.

17.    At all relevant times herein, Plaintiff met the definition of Defendants' "employee" under all applicable statues.

## FACTUAL ALLEGATIONS

18.    Plaintiff has been a member of the New York City Police Department ("NYPD" or the "Department") since January 2006 until his discriminatory termination by Defendants Kelly and the City of New York on January 29, 2013.

19.    At the time of his dismissal, Plaintiff was employed full duty and working patrol for the 50th Precinct.

20.    Plaintiff is an Egyptian born American Citizen and practicing Muslim.

21.    Throughout his seven years of service, Plaintiff was a valuable asset to the NYPD.   In 2010 Mr. Abdelal and his partner were awarded commendations by their commanding officer, in one instance for their valor in apprehending two armed suspects during a foot chase.   During the incident, Plaintiff, while off-duty and wearing flip-flops, observed and joined his colleagues during a foot pursuit and single-handedly apprehended a known-drug dealer who was then arrested and successfully prosecuted.

22.    In another act of heroism, Plaintiff and his partner responded to a shot fired on the corner of Heath Avenue and Kingsbridge Road, in the Bronx, New York.   Upon arriving at the scene they witnessed a young man who had been shot and attended to him while waiting for Emergency Medical Services.   Thanks to Plaintiff's thorough investigation of the scene, the NYPD, with Plaintiff's assistance, searched for and successfully apprehended the shooter.

23.    During his seven year career as an NYPD officer Plaintiff assisted the community in all aspects of criminal to civil resolution with professionalism and respect for the public. This

is evident in his excellent track record with the Civilian Complaint Review Board, as only one complaint has ever been lodged against him.

24.     Furthermore, Plaintiff Abdelal was assigned on numerous occasions as the House of Worship ("HOW") Officer to interact with various churches, synagogues and mosques in the confines of the 50th precinct.

25.     As HOW Officer Abdelal attended to the needs and security of the clergy and congregation on holy days and religious holidays.

26.     Prior to Plaintiff's termination he had never been suspended or placed on modified assignment.

27.     Further, Plaintiff consistently received excellent performance evaluations in the years leading up to his dismissal.

28.     For example, in 2010 and 2011 he received an overall rating of 3.5 – or "Highly Competent/ Competent."

29.     Furthermore, in March 2013, after Plaintiff had been terminated from the NYPD, he cooperated with the Bronx District Attorney's office regarding an arrest for robbery that occurred while Plaintiff was on patrol.  Plaintiff's cooperation, even after his termination, is representative of his dedication to the NYPD and his desire for reinstatement as a fully duty officer.

**Plaintiff was the subject of intense discriminatory profiling and investigation**

30.     Plaintiff visited the Hudson County Correctional Facility (the "Correctional Facility") on March 30, 2008, to assist his friends in identifying inmate Eslam Gadou, an Egyptian foreign national, whom Plaintiff  believed was guilty of stealing millions of dollars from Egyptian investors, including Plaintiff's friends.

31.     Plaintiff's close friends asked him to visit the facility to identify the detainee and gather any information that could help with prosecuting Mr. Gadou and extraditing him back to Egypt.

32.     Plaintiff agreed to do so, but told his friends that he was not sure what, if any, help he could provide in this particular situation.

33.     Before visiting, Plaintiff made several calls to the Correctional Facility in an attempt to gain information about Mr. Gadou.  During said phone calls, it was explained to Plaintiff that the Correctional Facility could not release the requested information over the phone, but that he should visit the Correctional Facility in person.

34.     When Plaintiff arrived at the Correctional Facility he explained to the corrections officer at the front desk that he was an off duty NYPD police officer working in the 50th Precinct and wished to visit Mr. Gadou who was being held on immigration issues.

35.     Sergeant Michael Prins ("Sergeant Prins" or "Prins") reported to the front desk, at which point Plaintiff again identified himself as an off duty NYPD Officer Abdelal from the 50th Precinct, presented his NYPD identification and explained that the inmate he wished to visit had stolen money from his personal friends.

36.     Sergeant Prins informed Plaintiff that he could not be granted access to Mr. Gadou because Plaintiff had no personal involvement with Mr. Gadou, was not related to Mr. Gadou and was not involved in the Immigration and Nationalization Services ("INS") case involving Mr. Gadou.

37.     Furthermore, Sergeant Prins explained that a formal agreement between the New Jersey Correctional Department and the NYPD was required before NYPD officers could be granted access to inmates at the Correctional Facility.

38.     With this information, Plaintiff promptly left the Hudson County Correctional Facility, having been inside the facility for only a short few minutes and never going past the lobby.

39.     When Plaintiff left the facility, Sergeant Prins called the NYPD Internal Affairs Bureau ("IAB") at One Police Plaza to alert them of Plaintiff's visit to the facility.

40.     Within a few hours of Plaintiff leaving the Correctional Facility IAB officers reported to the Correctional Facility to conduct an interview with Sergeant Prins.

41.     During the abovementioned interview, Sergeant Prins falsely accused Plaintiff of pretending to be member of Interpol in an attempt to gain access to the facility, while simultaneously informing the officers that Plaintiff worked at the 50th Precinct.

42.     That Plaintiff would claim to be a member of Interpol is preposterous. Indeed, if Plaintiff were trying to gain access to any inmate in a correctional facility – a routine part of the job for all law enforcement officers - he would be asked to see his credentials no matter what law enforcement body he identified himself with; so identifying himself with an obscure international police force would be the absolute last thing one would expect of someone with his professional experience, even if his motive for entry were personal.

43.     Further, Interpol is not a police force, does not make arrests or conduct investigations, and has all of five employees in the United States who are foreign citizens with no ability to work in New Jersey let alone conduct investigations into money laundering there. See, Savage, Order on Interpol Work Inside U.S. Irks Conservatives, The New York Times, December 30, 2009, available at http://www.nytimes.com/2009/12/31/world/31interpol.html?_r=0 (last visited April 14, 2014).

44.     Such a ruse would be entirely foolish, and not one a police officer would either need to engage in, or be remotely inclined to engage in, if he or she wished to make an attempt similar to the one Plaintiff made.

45.     Meanwhile Sergeant Prins' own anti-Muslim animus was revealed.

46.     During the abovementioned interview of Prins one of the IAB officers asked Sergeant Prins if there was anything unusual that stood out about the prisoner Plaintiff requested to visit, to which Prins replied "Middle Eastern descent."

47.     Later during the administrative trial surrounding Plaintiff's termination from the NYPD, Prins testified that he found this unusual given "everything going on in our country, unfortunately these are signs and things that we look out and prepare ourselves for unfortunately under the circumstances.  It's not profiling, it's nothing.  It's just putting one and one together, equals two."

48.     Contrary to NYPD policy, the Department failed to promptly conduct a GO15 investigation with Plaintiff regarding the Hudson County Correctional Facility incident and issue discipline if necessary.

49.     Rather, the Department launched a full-scale investigation into Plaintiff's personal and professional life in an attempt to fabricate reasons to terminate him and disguise Defendants' true motive for dismissing Plaintiff— his Egyptian national origin and Muslim faith.

50.     Notably, the investigation revealed no evidence that Plaintiff ever claimed to be a member of Interpol when visiting the Correctional Facility.

51.     Plaintiff was placed under surveillance and constantly followed by Defendants' agents, servants and assigns.

52.     Plaintiff was profiled for more than a year solely because of his nationality, ancestry and religion.

53.     Upon information and belief, Defendants caused Plaintiff to be audited by the IRS.  It was alleged that Plaintiff owed $20,000 to the IRS.  Notably, after the conclusion of Defendant's investigation, the IRS declared that Plaintiff did not owe any back taxes.

54.     Defendant also investigated Plaintiff's family members and friends, which unsurprisingly failed to uncover any illegal or terrorist activity by Plaintiff's family and friends.

55.     Meanwhile, Plaintiff was also placed on surveillance by the U.S. Immigration and Customs Enforcement Department and the U.S. Secret Service.

56.     Over the course of a year, the IAB worked in concert with the Department of Homeland Security to investigate and profile Plaintiff because of his race, national origin and religion.

57.     In fact, the OIA began making bogus calls to Plaintiff at the 50th Precinct's telephone number, whereupon an officer pretended to be an INS officer granting Plaintiff access to meet with Mr. Gadou at the Hudson County Correctional Facility.  This was clearly done in a failed attempt to lure Plaintiff back to the facility.

58.     It took the IAB Officer multiple attempted calls to reach Plaintiff.

59.     When the IAB Officer, pretending to be from the INS, finally was able to make contact with Plaintiff over the phone, he offered Plaintiff a chance to gain access to Mr. Gadou.

60.     Plaintiff immediately declined the offer to gain access to visit Mr. Gadou, informing the IAB Officer that there was no more need for access, as Plaintiff had  already informed his friend that he would need to get prosecution for MR Gadou through other means.

61.     During this conversation, Plaintiff offered the same information concerning Mr. Gadou's embezzlement of millions of dollars as he did early at the Correctional Facility.

62.     Meanwhile, during this same time period Plaintiff was the subject of two "random" integrity tests within months of each other conducted by the same undercover officer, who coincidentally appeared to be of Middle Eastern decent.

63.     It is NYPD policy to conduct integrity tests on its police officers on a random basis, thus the frequency with which Plaintiff was the subject of the integrity tests further reveals that Defendants' were trying to set Plaintiff up in the hopes of creating a reason to later terminate him. Such acts are blatantly pre-textual.

64.     Meanwhile, IAB officers conducted surveillance over Plaintiff's home and sent undercover agents to follow Plaintiff while he was off-duty.

65.     Following the yearlong investigation, in which Defendants sought to create reasons with which to terminate Plaintiff, and disguise the discriminatory intent of their actions, Plaintiff  Abdelal was charged with the following acts of misconduct by the Department:

(a) on September 22, 2007 it was alleged that Plaintiff  failed to properly search a prisoner in violation of Prisoners General Procedure 210-01;

(b) on March 30, 2008, it was alleged that Plaintiff  failed to notify a commanding officer of attempting to visit an inmate at Hudson Correctional facility in violation of P.G. Interim Order No. 11;

(c) it was alleged that Plaintiff  was engaged in off duty employment without obtaining prior approval, in violation of P.G. 205-40;

(d) between July 15, 2008 and July 19, 2008, it was alleged that Plaintiff  was absent from his residence while on sick report in violation of P.G. 205-01;

(e) between March 2008 and June 2008, it was alleged that Plaintiff falsely reported residing in New York, but in fact resided in New Jersey in violation of P.G. 203-18;

(f) on February 8, 2011, it was alleged that Plaintiff failed to prepare a UF-250 following a stop and frisk in violation of P.G. 203-05;

(g) on February 8, 2011, it was alleged that Plaintiff failed to maintain an Officer's Activity log in connection with the above stop and frisk in violation of P.G. 212-08.

66.     None of these violations, individually or in concert, warrant termination.

67.     After a thorough review of all the charges, the Advocates' Office, which imposes penalties on a regularly basis, offered as a penalty a loss of 30 vacation days and a 30 day suspension in exchange for a plea to the charges, Plaintiff countered with a proposal of a 60 day suspension and one-year probation, which the Advocates Office subsequently accepted.

68.     Defendant Kelly rejected the negotiated penalty and instead gave Plaintiff an ultimatum: resign without his retired police officer identification, or take the matter to trial.

69.     Plaintiff opted to take the matter to trial.

70.     As such, a five (5) day trial ensued, where the Department zealously presented its case, calling eight witnesses and offering numerous pieces of evidence into the record.

71.     Plaintiff plead guilty at the recommendation of his attorney to most of the charges of misconduct, however, he has always vehemently contested the allegation that he claimed to be a member of Interpol during an off duty visit to the Hudson County Correctional Facility.

72.     At the conclusion of the Administrative Hearing, the Deputy Commissioner of Trials ("DCT") Martin G. Karopkin submitted a forty-three page Report and Recommendation (the "Report") to the Commissioner dated May 23, 2012.

11

73.     DCT Karopkin found Plaintiff "guilty of several failures in his work as a police officer," including, failing to maintain a prison roster, failing to properly search a prisoner, going to Las Vegas while on sick leave, maintaining a residence in New Jersey and maintaining off-duty employment while his permission to do so had lapsed.

74.     However, upon careful consideration, Karopkin found that "none of these [work place failures], even in combination would ordinarily justify termination."

75.     Plaintiff was also found guilty of "going to the Hudson County Correctional Facility to visit a detainee without permission and representing himself as being engaged in an investigation where he was working for the Department and Interpol to gain access to the detainee."

76.     Plaintiff is currently challenging DTC Kapokin's determination of guilt as to the Hudson County Correctional Facility incident as against the weight of the evidence in an Article 78 proceeding in the New York State Appellate Division, First Department.[1]

77.     At no point did Plaintiff ever claim to be a member of Interpol.

78.     Plaintiff has at all times adamantly contested this allegation, seeking to admit into evidence an audio recording from his conversation at the Hudson County Correctional Facility, which would support his innocence as to this charge.

79.     Defendants failed to produce audio recordings of the Hudson County incident, despite testimony from Officer Prins, a twenty year veteran of the Hudson County Facility with full knowledgeable of the facilities capabilities, that an audio recording of the incident exists.

---

[1] The only evidence presented at trial that supports the allegation that Plaintiff claimed to be a member of Interpol is the testimony of Sergeant Prins, whose testimony also revealed his own anti-Muslim bias.  Meanwhile, there was ample evidence that Plaintiff did not claim to be a member of Interpol; including: (a) testimony from another officer at the Correctional Facility; (b) Plaintiff's own testimony as to his innocence, made under the impression that an audio of the conversation existed; and (c) the DTC's failure to impose a negative inference against the Department related to spoliation issues and its failure to produce evidence that would support Plaintiff's case.

80.     In relation to the Hudson County Correctional Facility incident, DCT Karopkin concluded that it was clear that the Department's penalty recommendation was based on the charges related to the Hudson County Correctional Facility.  In the view of DCT Kraropkin, while a serious offense, it *does not* warrant termination.

81.     Furthermore, DCT Karopkin determined that there is absolutely no evidence to indicate that Plaintiff Abdelal visited the Correctional Facility for personal gain or corrupt motive, rather it is uncontested that he was trying to assist people who he believed had been the victim of fraud on the part of the detainee.

82.     Finally, DCT Karopkin determined that while Plaintiff's actions related to the Hudson County Correctional Facility incident were misguided and merited significant penalty, *termination was not warranted*.

83.     Notably, DCT Karopkin's recommended penalty for these infractions was less than originally offered by the Advocates office – only recommending forfeiture of 45 vacation days and dismissal that would be held in abeyance for a period of one year, which is the equivalence of a one year probationary period.

84.     Dismissing the trial court's findings and recommendations, on January 18, 2013 Respondent Kelly disapproved of DCT Karopkin's recommended penalty, insisting instead on Plaintiff's dismissal from the NYPD without offering any rationale or reasoning for the decision or citing a single fact or precedent for the dismissal.

85.     In complete disregard for DCT Karopkin, Respondent Kelly issued a memorandum stating that he approved the DCT's finding but disapproved of the penalty, demanding Plaintiff's immediate separation from the Department.

86.     As such, Defendant Kelly offered Plaintiff a post-trial negotiated agreement, in which he will immediately file for Vested Interest Retirement, forfeit thirty vacation days, 30 suspension days (to be served), waive all time and leave balances and immediately be placed on a one-year dismissal, during which Plaintiff would agree to retire. This negotiated agreement was in effect a termination.

87.     Respondent Kelly provided no further reasoning to support his belief that Plaintiff's acts of misconduct, which both the Advocates Office and DCT Karopkin found to warrant only loss of vacation days and probationary periods, warranted immediate termination.

88.     Plaintiff rejected the negotiated agreement, which meant a forfeiture of his pension rights, in order to seek leave to initiate administrative or judicial proceedings seeking reinstatement and vindication of his reputation.

89.     Plaintiff was terminated because Defendant Kelly attempted but failed to link Plaintiff to terrorist activity. Plaintiff was targeted because of his race, religion and nationality. Said illegal discriminatory behavior was intentional and intolerable.

**<u>Defendant Kelly's termination of Plaintiff Abdelal was vastly disproportionate to the penalties imposed on non-Muslim NYPD officer</u>**

90.     Upon information and belief, non-Muslim NYPD officers under Respondent Kelly's command have been found guilty of actions far more egregious than those for which Plaintiff has been convicted, and have not been terminated.

91.     For example, after a judge recommended that an NYPD officer who paralyzed an unarmed man be terminated, Responded Kelly found that while the officer "violated department guidelines when he shot Admed Evans in the back…dismissal was not warranted." *See* Marzulli, EXCLUSIVE: NYPD Commissioner Raymond Kelly Won't fire cop for bad shooting, Daily

News, Nov. 20, 2013, available at http://www.nydailynews.com/new-york/brooklyn/exclusive-nypd-ray-kelly-won-fire-bad-shooting-article-1.1522754 (last visited on April 7, 2014).

92.     Additionally, when a Bronx officer, Alfonsina Delacruz pleaded guilty to excessive force and assault, she was allowed to keep her job and her penalty was akin to what was offered Plaintiff, 12-month probation and 40 lost vacation days.  *See* Jamie Schram, Bad Cop Cheats the Ax Again, New York Post, available at http://nypost.com/2013/07/01/bad-cop-cheats-the-ax-again/ (last visited on April 7, 2014).

93.     Meanwhile, upon information and belief, the vast majority of officers who have been terminated under Defendant Kelly's authority were found guilty of engaging in criminal activity or acts placing the public in substantial danger.

94.     Defendant Kelly's termination of Plaintiff was vastly disproportionate to the offenses charged, making it clear that the decision was made because of Plaintiff's race, national origin and religion.

95.     Upon information and belief, other non-Muslim officers who visited correctional facilities without prior authorization by the correctional facility or their commanding officer would be the subject of a GO15, charged with breaking NYPD patrol guide procedures and receive punishment in the form of a loss of vacation days.

96.     Meanwhile, Plaintiff was terminated for this same behavior, because of his race, national origin and religion.

97.     If Plaintiff's name was Michael, and not Mohamed, he would be an active member of the NYPD today.

**Defendant Kelly Has A Known Discriminatory Animus Towards Muslims, Arabic's and Individuals from Arabic Countries**

98.     Defendant Kelly's discriminatory animus towards the Muslim American community has been well documented.

99.     Defendant Kelly often used the power and control of his position as Commissioner of the NYPD to implement programs that targeted Muslim Americans for investigation as terrorists based on nothing more than their religious beliefs, ancestry and national origin.

100.     For example, the NYPD, under Defendant Kelly initiated program's to conduct surveillance on, spy on and infiltrate Muslim communities across the northeastern United States.

101.     Defendant Kelly had his agents attach cameras to telephone poles outside of mosques and catalogued the license plate numbers of everyone who enters for prayer, irrespective of whether they had any credible source indicating such mosque or individuals had terrorist ties.

102.     Defendant Kelly spied on Muslim student groups on 16 college campuses in New York, Connecticut, New Jersey and Pennsylvania and created a database of every Muslim owned business in the greater New York Area.

103.     Defendant Kelly insisted that under his leadership the NYPD and its officers and agents only followed legitimate leads and that their activities did not amount to religious or racial profiling; however, all evidence is to the contrary.

104.      During an investigation by the Associated Press (the "AP") into Defendant Kelly's programs and policies, the AP unearthed substantial amounts of evidence of religious and racial profiling occurring at the direction of Defendant Kelly.

16

105.    As another example of Defendant Kelly's discriminatory animus directed towards Muslims, was his featured in "The Third Jihad," a rabidly Islamophobic film.

106.    Under Defendant Kelly's watch, according to files uncovered by NYU's Brennan Center for Justice, the NYPD showed nearly 1,500 police officers during their training this anti-Islam propaganda film whose main narrative is that Muslims are trying to violently "infiltrate and dominate America."

107.    Kelly wrote in a letter to the Muslim Bar Association in March 2011 "The film was not and is not part of the approved training curriculum; it was projected on a screen while training attendees were completing administrative paperwork."

108.    The 72-minute video had been played on a "continuous loop" for a period of three months to a year and was witnessed by at least 1,489 police officers. Questions remain about exactly what role the film played in the training of the officers who were exposed to it.

109.    The filmmakers behind The Third Jihad provided the New York Times, who published an article about this, with evidence that Kelly had taken part in a 90-minute interview shot at NYPD headquarters in March 2007.

<u>**FIRST CAUSE OF ACTION**</u>
**Ancestry/National Origin Discrimination—Disparate Treatment in**
**Violation of Section 1981**
**(Civil Rights Act of 1866, 42 U.S.C.A §1981)**

110.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

111.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

112.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectation.

113.    Defendants' subjected Plaintiff to adverse employment actions on account of his protected status and denied him equal opportunity and treatment in the conditions of employment, including, but not limited to, (i) being subjected to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance, (iii) disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee, and (iv) discharging him from his position for insisting on equal treatment and opportunities in employment.

114.    Defendants discharged Plaintiff under circumstances giving rise to an inference of discrimination since non-Egyptian and/or non-Arabic workers who committed similar or worse infractions were not forced into termination by Defendants.

115.    By the acts and practices described above, the Defendants, directly and/or through their employees and/or agents, subjected Plaintiff to discrimination in violation of Section 1981.

116.    Defendant Kelly, who exercised managerial/supervisory control over Plaintiff participated directly and indirectly in the discriminatory acts, up to an including his termination, and failed to take corrective or remedial action.

117.    As a direct and/or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

### SECOND CAUSE OF ACTION
**Ancestry/National Origin Discrimination—Unlawful Harassment in
Violation of Section 1981
(Civil Rights Act of 1866, 42 U.S.C.A §1981)**

118.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

18

119.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

120.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectation.

121.     Plaintiff was subjected to a hostile working environment since the Defendants' workplace was permeated with highly offensive conduct and discriminatorily motivated intimidation, demeaning behavior and shunning that was significantly pervasive to alter the conditions of his employment and create an abusive and offensive working environment since he was, for extended periods of time, subjected on a near daily basis to discriminatory treatment, including but not limited to the prolonged campaign of profiling Plaintiff based on his ancestry/national origin.

122.    A specific basis exists for imputing the objectionable conduct to the employer because the NYPD's Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in any change in the conduct specified.

123.    The discriminatory conduct was frequent and severe.

124.    The discriminatory conduct was offensive and humiliating.

125.    The discriminatory conduct included, but was not limited to, subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such and excessively and unnecessarily scrutinizing his performance and disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee,  discharging him from his position for insisting on equal treatment and

opportunities in employment and generally being subjected to a working environment so discriminatory and hostile.

126.    The discriminatory conduct interfered with Plaintiff's work performance and impacted the terms and conditions of his employment.

127.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

128.    Defendant Kelly, who exercised managerial/supervisory control over Plaintiff participated in the discriminatory acts and failed to take corrective action.  As such, the Defendants are liable.

<u>THIRD CAUSE OF ACTION</u>
**Ancestry/National Origin Discrimination – Disparate Treatment in**
**Violation of Title VII**
**(Title VII Civil Rights Act of 1964, 42 U.S.C.A §2000e-5(f))**

129.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

130.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

131.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectation.

132.    Defendants, their supervisors, managers, agents, subordinate employees and assigns engaged in a course of discriminatory, intimidating and harassing treatment of Plaintiff that included but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance, (iii) disciplining him while

20

failing to do the same for other non-Egyptian and/or non-Arabic employee, and (iv) discharging

him from his position for insisting on equal treatment and opportunities in employment.

133.    Defendants' conduct as alleged herein, constituted unlawful employment

practices and unlawful discrimination on the basis of Plaintiff's ancestry/national origin in

violation of Title VII.

134.    On or about March 2013 Plaintiff timely filed a charge of discrimination with the

United States Equal Employment Opportunity Commission ("EEOC").

135.    On or about March 26, 2013, the EEOC issued a Notice of Right to Sue.

136.    This action was timely brought within ninety (90) days of the Right to Sue letter.

137.    Plaintiff has satisfied all statutory prerequisites for filing this action.

138.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer

mental anguish, emotional pain, lost wages, loss of quality of life, humiliation and out of pocket

expenses.

139.    As a result of Defendants' conduct, Plaintiff is entitled to recover monetary

damages, including but not limited to compensatory damages, punitive damages, interest,

attorney fees and all other fees, damages and costs allowed under the law.

140.    Defendants' conduct as alleged herein, was carried out with malice or reckless

disregard for Plaintiff's protected right to be free from discrimination, harassment and retaliation,

thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

## FORTH CAUSE OF ACTION
### Ancestry/National Origin Discrimination – Unlawful Harassment in Violation of Title VII
### (Title VII Civil Rights Act of 1964, 42 U.S.C.A §2000e-5(f))

141.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced

allegations as if fully set forth herein.

21

142.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

143.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectation.

144.    Defendants discriminated against Plaintiff on the basis of his ancestry and/or national origin in violation of the Title VII, by denying to him the equal terms and conditions of employment, including but not limited denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment.

145.    Defendants discriminated against Plaintiff on the basis of his ancestry and/or national origin in violation of the Title VII, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, subjecting Plaintiff to severe and pervasive discrimination and harassment.

146.    A specific basis exists for imputing the objectionable conduct to the employer because the NYPD's Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in any change in the conduct specified.

147.    The discriminatory conduct was frequent and severe.

148.    The discriminatory conduct involved humiliation in front of Plaintiff's colleges.

149.    The discriminatory conduct included being shunned within the workplace.

150.    The discriminatory conduct included, but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily

scrutinizing his performance, (iii) disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee,  (iv) discharging him from his position for insisting on equal treatment and opportunities in employment, and (v) generally being subjected to a working environment so discriminatory and hostile.

151.    Defendants' conduct as alleged herein, constituted unlawful employment practices and unlawful discrimination on the basis of Plaintiff's religion in violation of Title VII.

152.    Defendant knew or should have known of the discriminatory conduct engaged in by Plaintiff's peers and failed to take immediate and appropriate corrective action to prevent such conduct; as such, the Defendants are liable.

153.    On or about March 2013 Plaintiff timely filed a charge of discrimination with the EEOC.

154.    On or about March 26, 2013, the EEOC issued a Notice of Right to Sue.

155.    This action was timely brought within ninety (90) days of the Right to Sue letter.

156.    Plaintiff has satisfied all statutory prerequisites for filing this action.

157.     As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

158.    Defendants' conduct as alleged herein, was carried out with malice or reckless disregard for Plaintiff's protected right to be free from discrimination, harassment and retaliation, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

**FIFTH CAUSE OF ACTION**
**Religious Discrimination – Disparate Treatment in**
**Violation of Title VII**
**(Title VII Civil Rights Act of 1964, 42 U.S.C.A §2000e-5(f))**

159.   Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

160.   Plaintiff is a Muslim so he is within the protected class of individuals.

161.   Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectation.

162.   Defendant, its supervisors, managers, agents, subordinate employees and assigns engaged in a course of discriminatory, intimidating and harassing treatment of Plaintiff that included but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance, (iii) disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee, and (iv) discharging him from his position for insisting on equal treatment and opportunities in employment.

163.   Defendants' conduct as alleged herein, constituted unlawful employment practices and unlawful discrimination on the basis of Plaintiff's religion in violation of Title VII.

164.   On or about March 2013 Plaintiff timely filed a charge of discrimination with the EEOC.

165.   On or about March 26, 2013, the EEOC issued a Notice of Right to Sue.

166.   This action was timely brought within ninety (90) days of the Right to Sue letter.

167.   Plaintiff has satisfied all statutory prerequisites for filing this action.

168.    As a result of Defendants' conduct, Plaintiff Abdelal has suffered and continues to suffer mental anguish, emotional pain, lost wages, loss of quality of life, humiliation and out of pocket expenses.

169.    As a result of Defendants' conduct, Plaintiff is entitled to recover monetary damages, including but not limited to compensatory damages, punitive damages, interest, attorney fees and all other fees, damages and costs allowed under the law.

170.    Defendants' conduct as alleged herein, was carried out with malice or reckless disregard for Plaintiff's protected right to be free from discrimination, harassment and retaliation, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

**SIXITH CAUSE OF ACTION**
**Religious Discrimination – Unlawful Harassment in**
**Violation of Title VII**
**(Title VII Civil Rights Act of 1964, 42 U.S.C.A §2000e-5(f))**

171.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

172.    Plaintiff is a Muslim so he is within the protected class of individuals.

173.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectation.

174.    Defendants discriminated against Plaintiff on the basis of his religion in violation of the Title VII, by denying to him the equal terms and conditions of employment, including but not limited denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment.

175.    Defendants discriminated against Plaintiff on the basis of his religion in violation of the Title VII, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to

25

prevent or to remedy a hostile work environment that included, among other things, subjecting Plaintiff to severe and pervasive discrimination and harassment.

176.     A specific basis exists for imputing the objectionable conduct to the employer because the NYPD's Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in any change in the conduct specified.

177.     The discriminatory conduct was frequent and severe.

178.     The discriminatory conduct involved humiliation in front of Plaintiff's colleges.

179.     The discriminatory conduct included being shunned within the workplace.

180.     The discriminatory conduct included, but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance, (iii) disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee,  (iv) discharging him from his position for insisting on equal treatment and opportunities in employment, and (v) generally being subjected to a working environment so discriminatory and hostile.

181.     Defendants' conduct as alleged herein, constituted unlawful employment practices and unlawful discrimination on the basis of Plaintiff's religion in violation of Title VII.

182.     Defendant knew or should have known of the discriminatory conduct engaged in by Plaintiff's peers and failed to take immediate and appropriate corrective action to prevent such conduct; as such, the Defendants are liable.

183.     On or about March 2013 Plaintiff timely filed a charge of discrimination with the EEOC.

184.    On or about March 26, 2013, the EEOC issued a Notice of Right to Sue.

185.    This action was timely brought within ninety (90) days of the Right to Sue letter.

186.    Plaintiff has satisfied all statutory prerequisites for filing this action.

187.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

188.    Defendants' conduct as alleged herein, was carried out with malice or reckless disregard for Plaintiff's protected right to be free from discrimination, harassment and retaliation, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

**SEVENTH CAUSE OF ACTION**
**Ancestry/National Origin Discrimination – Disparate Treatment in**
**Violation of NYSHRL**
**(New York State Human Rights Law N.Y. Exec. Law §§ 296 *et seq.*)**

189.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

190.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

191.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectations.

192.    Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race, religion and national origin in violation of New York State Human Rights Law N.Y. Exec. Law §§296, 296(1)(a).

193.    Particularly, Defendant subjected Plaintiff to adverse employment actions on account of his protected status and denied him equal opportunity and treatment in the conditions of employment, including, but not limited to, (i) subjecting Plaintiff to prolonged and persistent

profiling because of his race, religion and national origin even though no credible source existed

to justify such, (ii) excessively and unnecessarily scrutinizing his performance, (iii) disciplining

him while failing to do the same for other non-Egyptian and/or non-Arabic employee, (iv)

discharging him from his position for insisting on equal treatment and opportunities in

employment, and (v) generally being subjected to a working environment so discriminatory and

hostile.

194.    The Defendants' acquiescence to the ancestry and national origin based hostility

towards Plaintiff's presence in the workplace, including but not limited to, the demeaning

conduct, consisting of persistent humiliation and shunning, and the overall fostering of a hostile

work environment, gives rise to an inference of discrimination based on Plaintiff's ancestry and/

national origin.

195.    By the acts and practices described above, the Defendant, directly and/or through

its employees and/or agents, subjected Plaintiff to discrimination in violation of NYSHRL.

196.    Defendant knew or should have known of the discriminatory conduct engaged in

by Plaintiff's peers and failed to take immediate and appropriate corrective action to prevent

such conduct; as such, the Defendant is liable.

197.    As a direct or proximate result of the Defendant's unlawful conduct, Plaintiff has

suffered irreparable injuries and monetary damages and will continue to do so unless the Court

grants relief.

## EIGHTH CAUSE OF ACTION
### Ancestry/National Origin Discrimination – Unlawful Harassment in Violation of NYSHRL
### (New York State Human Rights Law N.Y. Exec. Law §§ 296 *et seq.*)

198.     Plaintiff hereby repeats and re-alleges each and every one of the above-

referenced allegations as if fully set forth herein.

28

199.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

200.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectations.

201.    Defendants discriminated against Plaintiff on the basis of his ancestry and/or national origin in violation of the NYSHRL, by denying to him the equal terms and conditions of employment, including but not limited denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment.

202.    Defendants discriminated against Plaintiff on the basis of his ancestry and/or national origin in violation of the NYSHRL, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, subjecting Plaintiff to severe and pervasive discrimination and harassment.

203.    A specific basis exists for imputing the objectionable conduct to the employer because the NYPD's Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in any change in the conduct specified.

204.    The discriminatory conduct was frequent and severe.

205.    The discriminatory conduct involved humiliation in front of Plaintiff's colleges.

206.    The discriminatory conduct included being shunned within the workplace.

207.    The discriminatory conduct included, but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily

scrutinizing his performance, (iii) disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee, (iv) discharging him from his position for insisting on equal treatment, and (v) opportunities in employment and generally being subjected to a working environment so discriminatory and hostile.

208.    By the acts and practices described above, the Defendants, directly and/or through its employees and/or agents, subjected Plaintiff to discrimination in violation of NYSHRL.

209.    Defendant knew or should have known of the discriminatory conduct engaged in by Plaintiff's peers and failed to take immediate and appropriate corrective action to prevent such conduct; as such, the Defendants are liable.

210.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

## NINTH CAUSE OF ACTION

### Religious Discrimination – Disparate Treatment in

### Violation of NYSHRL
### (New York State Human Rights Law N.Y. Exec. Law §§ 296 *et seq.*)

211.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

212.    Plaintiff is a Muslim so he is within the protected class of individuals.

213.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectations.

214.    Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race, religion and national origin in violation of New York State Human Rights Law N.Y. Exec. Law §§296, 296(1)(a).

215.    Particularly, Defendant subjected Plaintiff to adverse employment actions on account of his protected status and denied him equal opportunity and treatment in the conditions of employment, including, but not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance and disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee,  (iii) discharging him from his position for insisting on equal treatment and opportunities in employment, and (iv) generally being subjected to a working environment so discriminatory and hostile.

216.    The Defendants' acquiescence to the ancestry and national origin based hostility towards Plaintiff's presence in the workplace, including but not limited to, the demeaning conduct, consisting of persistent humiliation and shunning, and the overall fostering of a hostile work environment, gives rise to an inference of discrimination based on Plaintiff's ancestry and/ national origin.

217.    By the acts and practices described above, the Defendant, directly and/or through its employees and/or agents, subjected Plaintiff to discrimination in violation of NYSHRL.

218.    Defendant knew or should have known of the discriminatory conduct engaged in by Plaintiff's peers and failed to take immediate and appropriate corrective action to prevent such conduct; as such, the Defendant is liable.

219.    As a direct or proximate result of the Defendant's unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

**TENTH CAUSE OF ACTION**
**Religious Discrimination – Unlawful Harassment in**
**Violation of NYSHRL**
**(New York State Human Rights Law N.Y. Exec. Law §§ 296 *et seq.*)**

220.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

221.     Defendants discriminated against Plaintiff on the basis of his religion in violation of the NYSHRL, by denying to him the equal terms and conditions of employment, including but not limited denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment.

222.     Defendants discriminated against Plaintiff on the basis of his religion in violation of the NYSHRL, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, subjecting Plaintiff to severe and pervasive discrimination and harassment.

223.     A specific basis exists for imputing the objectionable conduct to the employer because the NYPD's Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in any change in the conduct specified.

224.     The discriminatory conduct was frequent and severe.

225.     The discriminatory conduct involved humiliation in front of Plaintiff's colleges.

226.     The discriminatory conduct included being shunned within the workplace.

227.     The discriminatory conduct included, but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance and disciplining him while failing to do the same for other non-

Egyptian and/or non-Arabic employee, (iii) discharging him from his position for insisting on equal treatment and opportunities in employment, and (iv) generally being subjected to a working environment so discriminatory and hostile.

228.    By the acts and practices described above, the Defendants, directly and/or through its employees and/or agents, subjected Plaintiff to discrimination in violation of NYSHRL.

229.    Defendant knew or should have known of the discriminatory conduct engaged in by Plaintiff's peers and failed to take immediate and appropriate corrective action to prevent such conduct; as such, the Defendants are liable.

230.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

**ELEVENTH CAUSE OF ACTION**
**Ancestry/National Origin Discrimination – Disparate Treatment in**
**Violation of NYCHRL**
**(New York City Human Rights Law, Administrative Code § 8-107 *et seq.*)**

231.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

232.    Plaintiff is an Egyptian national origin and Arabic ancestry, so he is within the protected class of individuals.

233.    Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectations.

234.    Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race, religion and national origin in violation of New York City Human Rights Law, Administrative Code § 8-107 *et seq*.

235.    Particularly, Defendant subjected Plaintiff to adverse employment actions on account of his protected status and denied him equal opportunity and treatment in the conditions of employment, including, but not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance and disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee, (iii) discharging him from his position for insisting on equal treatment and opportunities in employment, and (iv) generally being subjected to a working environment so discriminatory and hostile.

236.    The Defendants' acquiescence to the ancestry and national origin based hostility towards Plaintiff's presence in the workplace, including but not limited to, the demeaning conduct, consisting of persistent humiliation and shunning, and the overall fostering of a hostile work environment, gives rise to an inference of discrimination based on Plaintiff's ancestry and/ national origin.

237.    By the acts and practices described above, the Defendants, directly and/or through its employees and/or agents, subjected Plaintiff to discrimination in violation of NYCHRL.

238.    Defendant Kelly, who exercised managerial/supervisory control over Plaintiff, participated in the discriminatory acts and failed to take corrective action; as such Defendant is strictly liable for its acts and those of its employees under the NYCHL.

239.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

**TWELFTH CAUSE OF ACTION**
**Ancestry/National Origin Discrimination – Unlawful Harassment in**
**Violation of NYCHRL**
**(New York City Human Rights Law, Administrative Code § 8-107 *et seq.*)**

240.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

241.     Plaintiff was subjected to a hostile working environment since the Defendants' workplace was permeated with discriminatory intimidation, demeaning behavior and insult that was sufficiently pervasive to alter the conditions of his employment and create an abusive working environment.

242.     A specific basis exists for imputing the objectionable conduct to the employer because the NYPD Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in the conduct of the specified.

243.     Regardless, under the NYCHRL, Defendant New York City is strictly liable for the unlawful acts of its employees and officers.

244.     The discriminatory conduct was frequent and severe.

245.     The discriminatory conduct was offensive and humiliating.

246.     The discriminatory conduct included, but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance and disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee,  (iii) discharging him from his position for insisting on equal treatment and opportunities in employment, and (iv) generally being subjected to a working environment so discriminatory and hostile.

247.     The discriminatory conduct interfered with Plaintiff's work performance and impacted the terms and conditions of his employment.

248.     As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

249.     Defendant Kelly, who exercised managerial/supervisory control over Plaintiff participated in the discriminatory acts and failed to take corrective action.  As such, the Defendants are liable.

**THIRTEENTH CAUSE OF ACTION**
**Religious Discrimination – Disparate Treatment in**
**Violation of NYCHRL**
**(New York City Human Rights Law, Administrative Code § 8-107 *et seq.*)**

250.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

251.     Plaintiff is a Muslim so he is within the protected class of individuals.

252.     Plaintiff performed satisfactorily since his job performance met or exceeded the Defendants' expectations.

253.     Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race, religion and national origin in violation of New York City Human Rights Law, Administrative Code § 8-107 *et seq.*

254.     Particularly, Defendant subjected Plaintiff to adverse employment actions on account of his protected status and denied him equal opportunity and treatment in the conditions of employment, including, but not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance and disciplining

him while failing to do the same for other non-Egyptian and/or non-Arabic employee, (iii) discharging him from his position for insisting on equal treatment and opportunities in employment, and (iv) generally being subjected to a working environment so discriminatory and hostile.

255.     The Defendants' acquiescence to religion-based hostility towards Plaintiff's presence in the workplace, including but not limited to, the demeaning conduct, consisting of persistent humiliation and shunning, and the overall fostering of a hostile work environment, gives rise to an inference of discrimination based on Plaintiff's religious beliefs.

256.     By the acts and practices described above, the Defendants, directly and/or through its employees and/or agents, subjected Plaintiff to discrimination in violation of NYCHRL.

257.     Defendant Kelly, who exercised managerial/supervisory control over Plaintiff, participated in the discriminatory acts and failed to take corrective action; as such Defendant is strictly liable for its acts and those of its employees under the NYCHL.

258.     As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

**FORTEENTH CAUSE OF ACTION**
**Religious Discrimination – Unlawful Harassment in**
**Violation of NYCHRL**
**(New York City Human Rights Law, Administrative Code § 8-107 *et seq.*)**

259.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

260.     Plaintiff was subjected to a hostile working environment since the Defendants' workplace was permeated with highly offensive and discriminatory intimidation, demeaning

behavior and insult that was sufficiently pervasive to alter the conditions of his employment and create an abusive working environment.

261.    A specific basis exists for imputing the objectionable conduct to the employer because the NYPD's Commissioner, Defendant Kelly, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in the conduct of the specified.

262.    Regardless, under the NYCHRL, Defendant New York City is strictly liable for the unlawful acts of its employees.

263.    The discriminatory conduct was frequent and severe.

264.    The discriminatory conduct was offensive and humiliating.

265.    The discriminatory conduct included, but was not limited to, (i) subjecting Plaintiff to prolonged and persistent profiling because of his race, religion and national origin even though no credible source existed to justify such, (ii) excessively and unnecessarily scrutinizing his performance and disciplining him while failing to do the same for other non-Egyptian and/or non-Arabic employee,  (iii) discharging him from his position for insisting on equal treatment and opportunities in employment, and (iv) generally being subjected to a working environment so discriminatory and hostile.

266.    The discriminatory conduct interfered with Plaintiff's work performance and impacted the terms and conditions of his employment.

267.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

268.    Defendant Kelly, who exercised managerial/supervisory control over Plaintiff participated in the discriminatory acts and failed to take corrective action.  As such, the Defendants are liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment and issue:

(a)   A judgment declaring the acts and practices of Defendants to be in violation of Title VII, 42 U.S.C. §2000e-5(g);

(b)   A judgment declaring the acts and practices of Defendants to be in violation of Section 1981, 42 U.S.C. §1981 *et seq*.;

(c)   A judgment declaring the acts and practices of Defendants to be in violation of New York State Human Rights Law, N.Y. Exec. Law §297(9);

(d)   A judgment declaring the acts and practices of Defendants to be in violation of New York City Human Rights Law, Administrative Code § 8-107 *et seq*.;

(e)   Injunctive relief in the form of reinstatement of Plaintiff to the NYPD;

(f)   An award in favor of Plaintiffs and against Defendants for his actual damages in an amount to be determined at trial for lost wages and benefits, including but not limited to, an award of back pay, front pay, overtime pay, benefits, earnings, privileges and interest lost as a result of said unlawful discrimination and unlawful harassment in accordance with Section 1981, 42 U.S.C. §1981 *et seq*.; Title VII, 42 U.S.C. §2000e-5(g); New York State Human Rights Law, N.Y. Exec. Law §297(9); and New York City Human Rights Law, Administrative Code § 8-107 *et seq*.;

(g) An award in favor of Plaintiffs and against Defendants for consequential damages, compensatory damages, punitive damages, attorney fees and for such other and further relief that may be deemed necessary and proper.

(h) An award to Plaintiff of the costs of this action, including reasonable attorneys' fees to the fullest extent permitted by the applicable laws and statues;

(i) An award of pre- and post-judgment interest on all of Plaintiff's statutory claims;

(j) Such other and further relief as this Court deems necessary and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

DATED:  July 3, 2014
             Brooklyn, New York

                        Stoll, Glickman & Bellina LLP

                        /s/ Chris Q. Davis_____

                        Christopher Q. Davis
                        Stoll, Glickman & Bellina, LLP
                        475 Atlantic Avenue
                        Third Floor
                        Brooklyn, NY 11217
                        (718) 852-3710

                        *Attorneys for Plaintiff*