USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __3/30/2020__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MOHAMED ABDELAL,** | |
| **Plaintiff,** | |
| -against- | **1:13-cv-04341 (ALC)** |
| **COMMISSIONER, RAYOND W. KELLY** and **CITY OF NEW YORK,** | **OPINION AND ORDER** |
| **Defendants.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Mohamed Abdelal ("Plaintiff"), a former police officer at the New York City Police Department ("NYPD"), brings this action against Defendants former Commissioner Raymond W. Kelly and City of New York (collectively, the "Defendants"). Specifically, Plaintiff alleges Defendants discriminated against him and subjected him to a hostile work environment because of his Egyptian national origin, Arab ancestry, and/or his Muslim religion. Plaintiff asserts such claims under 42 U.S.C. § 1981 ("§ 1981"), 42 U.S.C. §§ 2000 et seq., ("Title VII"), the New York State Human Rights Law, ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). *See* Am. Compl., ECF No. 19. Before the Court is Defendants' Motion for Summary Judgment. After careful consideration, Defendants' Motion is hereby **GRANTED**.

## BACKGROUND

Unless stated otherwise, the facts are drawn from the Parties' Rule 56.1 statements and construed in a light most favorable to the non-moving party, Plaintiff.

## I.     The Incident

Plaintiff is an Egyptian born, Muslim man, who worked as a police officer at the NYPD's 50th Precinct. On March 30, 2008, while off-duty, Plaintiff visited the Hudson County Correctional Facility ("Facility") to solicit information from Eslam Gadou, an Egyptian detainee being held for immigration violations and financial crimes. Defs.' R. 56.1 Smt. ¶ 1. There, without authorization from his commanding officer, Plaintiff identified himself as an NYPD officer and displayed his NYPD identification to Facility personnel. Defs.' R. 56.1 Stmt. ¶ 2. In explaining the purpose of his visit, Plaintiff told U.S. Immigration and Naturalization Services ("INS") Sergeant Michael Prins that he believed Mr. Gadou had stolen from Plaintiff's friend. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 3; Defs.' Ex A at 71:2–71:5; Defs.' Ex. C. at 13. Plaintiff was ultimately denied access to Mr. Gadou and subsequently left the facility. Defs.' R. 56.1 Stmt. ¶ 3. Following Plaintiff's departure, Sargent Prins called the NYPD Internal Affairs Bureau ("IAB") to alert them of Plaintiff's visit. Defs.' R. 56.1 Stmt. ¶ 4. The IAB consequently began investigating Plaintiff to determine whether there was any criminal association between him and Mr. Gadou. Defs.' R. 56.1 Stmt. ¶ 4.

## II.     The Investigation

The IAB conducted a very thorough investigation into Plaintiff. *See generally* Pl.'s Ex. 1. Of relevance, the IAB sought to determine whether Plaintiff or Mr. Gadou had ties to the Egyptian government or ties to terrorism. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 1 at 167–68, 550–51, 667–68, 706–13, 886–87. The IAB also conducted background checks on Plaintiff, his father and Mr. Gadou and reviewed Plaintiff's financial information, business dealings, cell phone call history, computer inquiries on NYPD systems and

travel. Pl.'s Resp. Defs.' R 56.1 Stmt. ¶ 4; Pl.'s Ex. 1 at 387–93, 398, 477–81, 668–69, 741–52, 759, 825, 863, 865–67, 876, 883, 885–88. Beyond checks and reviews, the IAB conducted a few controlled calls of Plaintiff, surveillance of Plaintiff at his parents' house, and two interviews of Plaintiff. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 1 at 477–81, 815; Pl.'s Ex. 17 ¶¶ 2:6–2:13, 35:9–25:12. During one of these interviews, the IAB informed Plaintiff of the investigation. Pl.'s Ex. 17 ¶¶ 2:6–2:13. Plaintiff reportedly was emotionally distressed after learning about the investigation and as a result, sought psychiatric treatment. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 8 at 79:9–80:10, 98:23–102:23.

In general, Plaintiff's IAB file is voluminous. *See generally* Pl.'s Ex. 1. On one page of the file, there is a note referring to the investigation as "the Egyptian case." Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 1 at 398. In addition, one of the investigators indicated that Plaintiff's Middle Eastern heritage was "in the back of her mind" throughout the investigation. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Defs.' Ex. C at 6; Pl.'s Ex. 8 at 79–80, 99–102.

Subsequently, the IAB concluded the investigation on September 16, 2009 and determined that Plaintiff "did not associate with Eslam Gadou." Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 1 at 771. On October 9, 2009, the IAB placed Plaintiff on Level II Performance Monitoring. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 2 at 59–60.  As a part of the Level II Performance Monitoring, Plaintiff was subjected to quarterly reviews, monitoring by the Performance Monitoring Unit and integrity tests.[1] Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 2 at 57-60. In addition, the performance monitoring was placed on Plaintiff's Central Personnel

---

[1] Integrity tests are covert examinations tests whereby undercover officers post as civilians and covertly assess officers under Level II Performance monitoring.

Index, a database consisting of personnel information. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 4; Pl.'s Ex. 2 at 57. During the course of the investigation and monitoring, Plaintiff testified that his work responsibilities did not change. Defs.' Ex. A ¶¶ 48:3–48:8; 79:9–79:25; 85:2–85:7; 86:4–86:15.

### III.    Charges and Specifications Preferred Against Plaintiff

During and following the investigation, the NYPD Advocate's Offices ("DAO") filed 11 charges specifications against Plaintiff, which emanated from four disciplinary cases, Defs.' R. 56.1 Stmt. ¶ 5. Specifically, On September 5, 2008, the DAO preferred the following two specifications against Plaintiff under disciplinary Case No. 2008-254:

1. Said Police Officer Mohammed Abdelal, while assigned to the 50th Precinct, while on duty, on or about September 22, 2007, within the confines of the 50th Precinct, did fail to properly search a prisoner, as required.
2. Said Police Officer Mohammed Abdelal, while assigned to the 50t Precinct, while on duty, on or about September 22, 2007, within the confines of [t]he 50th Precinct, did fail to properly maintain a prisoner officer . . . as required.

Defs.' Ex. F. at 2.

On August 17, 2009, under Disciplinary Case No. 2009–320, the DAO filed the following 3 specifications against Plaintiff, two of which were related to the incident at the facility:

1. Said Police Officer Mohamed Abdelal, assigned to the 50th Precinct, while off-duty, on or about March 30, 2008, did fail to notify his Commanding Officer when attempting to visit an inmate in Hudson County Correctional Facility, as required.
2. Said Police Officer Mohamed Abdelal, assigned to the 50th Precinct, while off-duty, on or about March 30, 2008 did wrongfully engage in conduct prejudicial to the good order, efficiency and discipline of the Department, in that said Police Officer did provide false or misleading information to Immigration and Naturalization Services Officer(s), in that said Police Officer did represent to said Officer(s) that he needed to interview an inmate as a part of an Official Investigation involving INTERPOL, when said Police Officer was not involved in any such investigation.

3. Said Police Officer Mohamed Abdel[al], assigned to the 50th Precinct, on or about and between January 1, 2009 and May 20, 2009, was engaged in off duty employment without obtaining an approved off duty employment application, as required.

Defs.' Ex. F. at 7.

Additionally, on September 3, 2009, the DAO filed the following charges and specifications against Plaintiff:

1. Said Police Officer, Mohamed Abdelal, while assigned to the 50th precinct, while on sick report, on or about and between July 15, 2008 and July 19, 2008, was wrongfully, and without just cause, absent from his residence beyond his authorized pass hours without permission or authority of said officer's District Surgeon and/or the Medical Division Sick Desk Supervisor.
2. Said Police Officer, Mohamed Abdelal, while assigned to the 50th precinct, while on sick report, on or about and between July 15, 2008 and July 19, 2008, while on sick report, did leave the confines of the City or resident counties without the approval of the Chief of Personnel.
3. Said Police Officer, Mohamed Abdelal, while assigned to the 50th Precinct, while on sick report/ on or about and between June 2008 to March 10, 2009, did fail to reside within the confines of the City or residence counties, as required.
4. Said Police Officer Mohamed Abdelal, while assigned to the 50th Precinct, while on sick report, on or about and between June 2008 to March 10, 2009, did wrongfully cause false entries to be made in department records and that said police officer did in fact, reside in New Jersey.

Defs.' Ex. F. at 13–14.

Lastly, on November 1, 2011, under Disciplinary Case No. 2011-5996 , the DOA filed the following charges and specifications against Plaintiff for failing an integrity test administered during his Level II Disciplinary Monitoring status:

1. Said Police Officer Mohamed Abdelal, assigned to the 50th precinct, on or about February 8, 2011, within the confines of the 50th Precinct, in Bronx County, said officer did fail and neglect to perform said officer's duties, to wit said officer failed to prepare a UF–250 following a stop and question of a male known to this Department, as directed by competent authority.
2. Said Police Officer Mohamed Abdelal, assigned as indicated in Specification #1, on or about February 8, 2011, within the confines of the 50th Precinct, in Bronx County, did fail and neglect to maintain said officer's Activity Log (PD 112–145), to wit said

officer failed to make entries relating to a stop and question of a male known to this Department.

Defs.' Ex. F. at 17.

### IV. The Adjudication

Given the number of charges and specifications pending against Plaintiff, the DAO offered Plaintiff a pre-trial plea. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 8. Plaintiff pled guilty to seven of the specifications and went to trial on the remaining four. Defs.' R. 56.1 Stmt. ¶¶ 5, 6; Pl.'s Resp. Defs.' R 56.1 Stmt. ¶ 8. Specifically, Plaintiff did not plead to: Specification No. 1 of Case No. 2008-254, failing to properly search a prisoner; Specification 2 of Case No. 2009-320, providing misleading or false information to INS concerning his visit to the facility; Specification Nos. 1 and 2 of Case No. 2011-5996, failing to fill out a UF-250 report and failing to make proper entries in his activity log, which emanated from the integrity testing. *See* Defs.' Ex. E at 1.

After the trial, Deputy Commissioner of Trials ("DCT") Martin G. Karopkin submitted a Report and Recommendation to Defendant Kelly. *See generally* Defs.' Ex. C. DCT Karopkin found Plaintiff guilty of failing to properly search a prisoner and falsely informing INS that he that he needed to interview detainee Gadou as part of an official investigation with Interpol. Plaintiff was found not guilty of the specifications related to failing the integrity test; as a result, DCT Karopkin dismissed those specifications. Defs.' R. 56.1 Stmt. ¶ 7; Defs.' Ex. C at 14, 35−42; Defs.' Ex. E. The report recommended a penalty consisting of forfeiture of 45 vacation days and dismissal that would be held in abeyance for a one-year period. Defs.' Ex C at 42. However, Defendant Kelly dismissed the report's recommendation. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 8. Instead, Defendant Kelly offered Plaintiff a post-trial negotiated agreement, under

which Plaintiff was required to file for vested interest retirement, forfeit thirty vacation days, be suspended for a 30-day period and waive all time and leave balances, and be placed immediately on a one-year dismissal. *Id.* Plaintiff rejected said negotiated agreement. *Id.* Ultimately, Plaintiff was terminated from the NYPD on January 29, 2013. Defs.' R. 56.1 Stmt. ¶ 8.

## V. Other Relevant Information Concerning the NYPD

Under Defendant Kelly's leadership, other non-Muslim and non-Egyptian officers who were subject to some of the charges that were filed against Plaintiff did not face termination. For example, PO Gonzalez, a Hispanic male, who was Plaintiff's partner during the integrity test, faced no disciplinary action for failing the integrity test. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 7; Defs.' Ex. C 40−41; Pl.'s Ex. 9 ¶ 14. At the time of the test, PO Gonzalez had four disciplinary charges filed against him, two of which were for unjustified force. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 7; Defs.' Ex. C 40-41. Similarly, a white, Catholic, American born officer, Stephen B., knowingly associated with a criminal; without authorization, visited said criminal while incarcerated; failed to comply with direct orders not to associate with said criminal; failed to notify the Operations Unit of unusual police occurrences; and engaged in and/or incidents that required a police response or resulted in the filing of a domestic incident report. Pl.'s Resp. to Defs.' R. 56.1 Stmt. 8; Pl.'s Ex. 3 at 132–136; Pl.'s Ex. 4; Pl.'s Ex. 20. Stephen B. pleaded guilty to all of these charges except failing to comply with direct orders not to associate with a criminal to which he was found guilty. Pl.'s Ex. 3 at 132-136. Lastly, Defendant Kelly testified that he was aware of other police officers disciplined by him for lying with respect to their official function who were not terminated. Pl.'s Resp. to Defs.' R. 56.1 Stmt. 8; Pl.'s Ex. 5 at 118:20–118:25.

In addition, around the time of the IAB investigation the NYPD published a report entitled "Radicalization in the West: The Homegrown Threat," which included a preface from Defendant Kelly. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s Ex. 13. The report included statements such as the following "the City's Muslim communities have been permeated by extremists who have and continue to sow the seeds of radicalization." Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s Ex. 13 at 67. It also identified "[w]earing traditional Islamic clothing, growing a beard," "[j]oining or forming a group of like-minded individuals in a quest to strengthen one's dedication to Salafi Islam," and "[g]iving up cigarettes, drinking, gambling and urban hip-hop gangster clothes" as indicators of radicalization. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s Ex. 13 at 31. Furthermore, in 2010 the NYPD utilized a training video entitled "The Third Jihad." Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s Ex. 12. The video was removed from training after several complaints that it was offensive. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s Ex. 12. Defendant Kelly also publicly apologized for the film and testified that the video was offensive. Pl.'s Resp. Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s Ex. 5 at 93:7–104:25.

## VI.     Procedural Background

After discovery, Defendants moved for summary judgment. The Court granted Defendants motion on March 31, 2017, based on claim preclusion and timeliness. *See* Order, ECF No. 130. Plaintiff then appealed the decision to the Second Circuit, which remanded the action back to the this Court, finding that collateral estoppel did not apply to Plaintiff's discrimination claims and Plaintiff's hostile work environment claims were not untimely. *See* Mandate of USCA, ECF No. 142.

On August 26, 2019, Defendants again moved for summary judgment, arguing Plaintiff cannot demonstrate a *prima facie* case of discrimination under § 1981, Title VII, the NYSHRL and/or the NYCHRL as there is no evidence that his treatment by Defendants was in any way connected to his ancestry, national origin or religion. Instead, Defendants argue, the undisputed material facts demonstrate that Plaintiff's employment was terminated because he repeatedly engaged in misconduct resulting in several disciplinary charges that were adjudicated and substantiated after a full disciplinary trial. Additionally, Defendants argue Plaintiff's Title VII claims against Defendant Kelly fail because Title VII does not provide for individual liability. Concerning the remaining claims, Defendants assert Plaintiff does not offer sufficient evidence to support a finding of a hostile work environment and fails to establish §1981 claims against the City because he does not show his rights were violated as a result of municipality policy or practice.

## LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a fact is material if it would "affect the outcome of the suit under governing law"). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.,* 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events, because those matters are reserved for the jury. *Jeffreys v. City of New York,* 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson,* 477 U.S. at 252). In discrimination cases,

> summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.

*Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (footnote and citations omitted). *See also Risco v. McHugh*, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012).

## DISCUSSION

### I. Discrimination

Plaintiff brings claims against Defendants pursuant to §1981, Title VII, NYSHRL and NYCHRL.[2] Pursuant to §1981, Title VII and the NYSHRL discrimination claims are reviewed under the burden-shifting approach promulgated by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–04 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing: "(1) he belongs to a protected group;

---

[2] As an initial matter, Plaintiff's Title VII claims against Defendant Kelly are dismissed because "individuals are not subject to liability under Title VII. *Sassaman v. Gamache*, 566 F.3d 307, 315-16 (2d Cir. 2009) (citations omitted).

(2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of race [or religious] discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir. 2003)).

Once a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to provide a "legitimate, non-discriminatory reason for its actions." *Kirkland*, 760 F.3d. at 225 (citing *McDonnell Douglas*, 411 U.S. at 802). "This burden is one of production, not persuasion. . ." *Isaac v. City of N.Y.*, 701 F. Supp. 2d 477, 487 (S.D.N.Y. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the defendant provides a legitimate, non-discriminatory justification, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for [prohibited] discrimination." *Kirkland*, 760 F. 3d at 225. At this stage, mere allegations are insufficient. The plaintiff must submit "admissible evidence . . . [that] show[s] circumstances that would be sufficient to permit a rational finder of fact to infer that [the employer's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry*, 336 F.3d at 138).

However, the NYCHRL imposes a more lenient standard. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)) ("The NYCHRL, for example, applies a more lenient standard than Title VII to discrimination and hostile work environment claims."). "[T]he plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her [protected characteristic].'" *Mihalik*, 715 F.3d at 110 (citing *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 39 (2009)). With that said,

[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.*

Here, the Defendants do not dispute the first two factors. Accordingly, the following discussion will focus on whether the Defendants took adverse employment actions against Plaintiff that give rise to an inference of discrimination. Defendants primarily contend that Plaintiff cannot establish a *prima facie* showing of discrimination because there is no evidence to support discriminatory intent related to Plaintiff's termination. In response, Plaintiff first argues that he suffered other materially adverse actions beyond termination, namely the IAB investigation and the Level II Performance monitoring.[3] Plaintiff further asserts that the Defendants' intrusive surveillance, excessive discipline, and his ultimate termination support an inference of discrimination based on evidence of similarly situated employees and the Defendants' bias-based profiling practices.

The Second Circuit has held

> [a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

---

[3] Although Plaintiff additionally identifies integrity testing, supplemental charges and the summary included on his Central Personnel Index ("CPI") as separate and independent adverse actions, these occurred during the course of or as a result of the Level II Performance Monitoring. Hence, the Court will analyze integrity testing and supplemental charges in the context of Level II Performance Monitoring. Concerning the former, even if the Court were to analyze integrity testing separately, Plaintiff would not establish an inference of discrimination or unequal treatment because Plaintiff's partner, PO Gonzalez, a Hispanic police officer, was subjected to a command discipline and Plaintiff's charges related to failing the integrity test were dismissed. Further, Plaintiff and his partner were not similar situated in all material respects; unlike PO Gonzalez, Plaintiff was under Level II Performance Monitoring when he failed the integrity test.

*Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotation marks, alterations, and citations omitted). Although the Second Circuit has not articulated a bright line rule for what constitutes an adverse action, it has clarified that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Id.* at 91; *see also  Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 83 (E.D.N.Y. 2002) (internal quotation marks and citations omitted) ("There are no bright-line rules for determining whether an employee has suffered an adverse employment action; accordingly, the Court must pore over each case to determine whether the challenged employment action reaches the level of adverse."). "The relevant question is therefore whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment." *Joseph*, 465 F.3d at 92 n.1. With these principles in mind, the Court finds that Plaintiff's termination constitutes an adverse employment action. *See id.* at 90. The Court further finds that neither the IAB investigation nor the Level II Performance Monitoring constitutes an adverse employment action.

Generally, courts in this Circuit have found investigations that did not result in negative consequences were not adverse actions. *See e.g., Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226–29 (E.D.N.Y. 2016) (concluding that the investigation and monitoring of Plaintiff were not adverse because they did not "result[] in any change, material or otherwise, in the terms or conditions of [Plaintiff's] employment). Similarly courts in this Circuit have found that "excessive scrutiny do[es] not constitute [an] adverse employment action[] in the

absence of other negative results such as a decrease in pay or being placed on probation." *Abraham v. Potter*, 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (quoting *Honey v. Cty. of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)); *see also Jaeger*, 191 F. Supp. 3d at 226–29 (collecting cases). However, even in circumstances where an investigation or monitoring results in negative consequences, such as termination, courts must consider whether such investigations or surveillance were reasonable. *See e.g., Cintron v. Atticus Bakery, LLC*, 242 F. Supp. 3d 94, 101–03 (D. Conn. 2017) (determining an investigation "was a reasonable response to information that had been presented to the company" and therefore was not an adverse action); *see also Joseph*, 465 F.3d at 90.

In this case, both the IAB investigation and the Level II Performance Monitoring were followed by negative results. For example, the IAB investigation formed the basis of one of the charges of which Plaintiff was found guilty. Similarly, as a part of the Level II Performance Monitoring Plaintiff was subjected to integrity testing that formed the basis of other specifications to which Plaintiff pled. However, Plaintiff neither argues nor provides sufficient support for the conclusion that it unreasonable for the Defendants to initiate the investigation in light of Plaintiff's visit to the facility. Relatedly, Plaintiff neither claims nor provides sufficient support for the conclusion that it was unreasonable for the Defendants to place Plaintiff on Level II Performance Monitoring in light of his disciplinary history.

Plaintiff additionally fails to demonstrate that steps taken during the investigation and monitoring were unreasonable such that they changed the terms or conditions of Plaintiff's employment. In fact, Plaintiff testified that his work responsibilities remained the same during the investigation and monitoring. *Cf. Bind v. City of N.Y.*, 08 Civ. 1105, 2011 WL 4542897, at

*10 (S.D.N.Y. Sept. 30, 2011) (internal quotation marks and citation omitted) (finding surveillance was an adverse employment action because it caused Plaintiff "to be subject to significantly different responsibilities."). Furthermore, Plaintiff's arguments as to why the investigation and monitoring are adverse actions are largely conclusory, offer minimal factual support, and misconstrue the law.[4] Accordingly, the Court finds the Defendants "simply applied reasonable disciplinary procedures to" Plaintiff by undertaking and conducting the IAB investigation and Level II Performance Monitoring, and therefore the Defendants did not "exceed[] those procedures" nor "change[] the terms and conditions of [Plaintiff's] employment." *Joseph*, 465 F.3d at 92 n.1.

Next, the Court must analyze whether Plaintiff establishes his termination gives rise to an inference of discrimination. Plaintiff primarily argues that evidence of bias-based profiling by the IAB, statements by Defendant Kelly concerning Muslim populations and evidence of

---

[4] For example, Plaintiff relies on a case involving a retaliation claim to support the proposition that investigations and monitoring are adverse actions in the context of disparate impact discrimination claims. As courts in this District have noted, "Title VII's 'antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Villar v. City of New York*, 135 F. Supp. 3d 105, 135 (S.D.N.Y. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Instead, to establish the adverse action element of a retaliation claim a Plaintiff must "show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Villar*, 135 F. Supp. 3d at 135 (quoting *Burlington N.*, 548 U.S. at 68. Because adverse actions under discrimination claims and retaliation claims are defined differently, adverse action determinations in the context of retaliation claims are inapplicable to Plaintiff's claims. *See e.g., Mullins v. city of New York*, 626 F. 3d at 55. In addition, Plaintiff's reliance on *Villar* is unavailing. 135 F. Supp. 3d at 122-23. In that case, the plaintiff was similarly investigated, charged, prosecuted and ultimately terminated. *Id.* at 113–18. Of relevance, two of her discrimination claims were based on the filing of disciplinary charges against her, the prosecution of those charges, and the finding that she was guilty of those charges. *Id.* 122–23. The Court in dismissing these discrimination claims did not address whether the investigation or the filing of charges against the plaintiff was adverse. *Id.* Instead, the Court focused its reasoning exclusively on Plaintiff's failure to establish an inference of discrimination. As a result, *Villar* cannot be used to draw any conclusions concerning whether the IAB investigation or the Level II Performance Monitoring were adverse actions.

similarly situated individuals receiving less harsh penalties give rise to an inference of discrimination.

In the Second Circuit "[a] plaintiff may raise . . . an inference [of discrimination] by showing that the employer subjected him [or her] to disparate treatment, that is, treated him [or her] less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted). To do so, a "plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53–54 (2d Cir. 2001). The Second Circuit has held "'[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury' and rather than focus on 'precise equivalence,' courts should consider: '(1) whether the plaintiff and those she maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness.'" *O'Toole as Tr. of Estate of Fratto v. Cty. of Orange*, No. 16 CIV. 2059 (NSR), 2019 WL 1099721, at *7–8 (S.D.N.Y. Mar. 8, 2019) (quoting *Graham v. Long Island R.R.*, 230 F.3d at 39-40). "Plaintiff's burden in this respect is 'minimal.'" *Keaton v. Unique People Servs., Inc.*, No. 15-CV-5354, 2018 WL 3708658, at *4 (S.D.N.Y. Aug. 3, 2018) (quoting *McGuinness*, 263 F.3d at 53). Although a Plaintiff may support a claim of disparate treatment by offering pattern or practice evidence, such evidence is neither necessary nor sufficient to establish a discrimination claim. *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 150 (2d Cir. 2012).

Here, to support his discrimination claims based on termination, Plaintiff offers comparator evidence consisting of eight individuals who were subjected to disciplinary action under Defendant Kelly's leadership. *See* Pl.'s Ex. 3; Pl.'s Ex. 4. Of those eight, Plaintiff only establishes that one of those individuals, Stephen B., was outside of Plaintiff's protected group; in particular, Stephen B. self-reported to the Equal Employment Opportunity Office that he is white, American and Catholic. *See* Pl.'s Ex. 3; Pl.'s Ex. 4; Pl.'s Ex. 20. Although Plaintiff, as the non-moving party, is entitled to all reasonable inferences, Plaintiff's conclusory allegations that the other comparators were non-Muslim or non-Egyptian is insufficient, without more, to raise genuine issues of material fact. Accordingly, the Court may not rely on comparators other than Stephen B. to draw conclusions as to whether Plaintiff has established circumstances giving rise to an inference of discrimination as it relates to his termination.

Concerning Stephen B., the Court finds that he was not similarly situated to Plaintiff in all material respects. As a preliminary matter, it appears that Plaintiff and Stephen B. as NYPD police officers were subject to the same workplace standards. Defendants do not dispute this point. Instead, Defendants argue that Plaintiff and Stephen B. are not similarly situated because they faced different charges and engaged in different conduct. The Court agrees.

Stephen B. was charged with: knowingly associating with a criminal; without authorization, visiting said criminal while incarcerated; failing to comply with direct orders not to visit said inmate; failing to notify the Operations Unit of unusual police occurrences; and engaging in domestic verbal disputes and/or incidents that required a police response or resulted in the filing of a domestic incident report. In other words, Stephen B.'s charges concerned maintaining an unauthorized personal relationship with a criminal and participating in verbal

disputes with members of his household. Unlike Stephen B., Plaintiff's charges did not involve conduct that was purely personal in nature. In fact, Plaintiff's charges concerned conducting an unofficial investigation and lying to INS by stating he was involved in an official investigation with INTERPOL. Accordingly, when considering the totality of the circumstances, a reasonable jury could not conclude Stephen B. and Plaintiff engaged in similar conduct. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citations omitted) ("As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury. This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").[5] Because Plaintiff fails to raise an inference of discrimination, he fails to establish a *prima facie* case of discrimination under Title VII, § 1981 and the NYSHRL; similarly, because he fails to show unequal treatment, he has not asserted a viable discrimination claim under the NYCHRL. Defendants are therefore **GRANTED** summary judgment as to the discrimination claims.

## II.     Hostile Work Environment

To prevail on a claim of a hostile work environment pursuant to § 1981, Title VII or the NYSHRL, a plaintiff must show that, because of his membership in a protected class, his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, (1993) (quotation marks and citations omitted); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 227 (2d Cir.

---

[5] For the same reason, even if Plaintiff had established the other comparators were in fact non-Muslim or non-Egyptian, Plaintiff's claim would fail to establish they were similarly situated in all material respects; none of the identified officers faced charges involving lying about being involved in an official investigation.

2004); *Forrest v. Jewish Guild for Blind*, 3 N.Y.3d 295, 310 (N.Y. 2004) (applying standard for New York state law claim of hostile work environment). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271 (2001) (internal quotation marks and citation omitted). In addition, a plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted).

In determining whether an environment is "hostile" or "abusive," courts analyze the totality of the circumstances, including: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with the employee's work performance." *Harris*, 510 U.S. at 23. A single act can meet this threshold, but only if, "by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000); *Richardson v. N. Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)). A plaintiff must also show both that he found the environment offensive, and that a reasonable person also would have found the environment to be hostile or abusive. *Harris*, 510 U.S. at 21–22; *see also Schwapp*, 118 F.3d at 110; *Carter v. New Venture Gear, Inc.*, 310 Fed. App'x 454, 457–58 (2d Cir. 2009).

By contrast, to prevail on a hostile work environment claim under the NYCHRL, a Plaintiff must only show that the harassing conduct resulted in unequal treatment; as a result, the "severity" and "pervasiveness" of the conduct is germane to the issue of damages, not liability.

*Mihalik,* 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76 (1st Dep't 2009); *see also Pedrosa v. City of New York*, No. 13 CIV. 01890 LGS, 2014 WL 99997, at *4–11 (S.D.N.Y. Jan. 9, 2014) (citation omitted) ("A hostile work environment claim under the NYCHRL, unlike that under its state counterpart, does not require the complained-of conduct to be 'severe and pervasive.'"). That said, even under the NYCHRL, "'petty, slight, or trivial inconvenience[s]' are not actionable." *Kumaga*, 910 N.Y.S.2d 405, 2010 WL 1444513, at *14 (quoting *Williams*, 872 N.Y.S.2d at 38); *see also Mihalik,* 715 F.3d 102 at 114.

The Second Circuit has cautioned district courts that the existence of a hostile work environment "presents mixed question[s] of law and fact that are especially well-suited for jury determination." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (internal quotation marks and citations omitted). Thus, "[t]hat the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Id.* (internal quotation marks and citation omitted).

Here, Plaintiff argues that the NYPD fostered an environment that was openly hostile to Muslims and those of Middle Eastern decent. In support of this argument, Plaintiff identifies the NYPD's report entitled "Radicalization in the West: The Homegrown Threat" and the training video entitled, "The Third Jihad" as contributing to the unnecessary surveillance of Muslim individuals, including Plaintiff, and instilling prejudicial attitudes towards Muslims at the NYPD. Plaintiff asserts that these prejudicial attitudes resulted in the IAB investigation, which he claims unnecessarily treated him as a criminal and terrorist.

For reasons articulated in the discussion of Plaintiff's discrimination claims, the Court finds Plaintiff fails to establish a hostile work environment claim under § 1981, Title VII or the NYSHRL. Specifically, Plaintiff fails to establish the investigation was discriminatory, that it was unreasonable for the NYPD to investigate Plaintiff in light of his unauthorized visit to the facility or that it was unreasonable for the NYPD to place Plaintiff on Level II Performance Monitoring considering his disciplinary history. *Cf. Carillo v. Ward*, 770 F. Supp. 815, 822 (2d Cir. 1991) (finding a hostile work environment where Defendants' surveillance was unfounded). Accordingly, it cannot be said that either the investigation or monitoring were motivated by discriminatory animus. Similarly, Plaintiff fails to establish a violation of NYCHRL because he has not shown he faced unequal treatment. Plaintiff's hostile environment claims must therefore be dismissed. To the extent that Plaintiff asserts an independent claim of hostile work environment based solely on the training video and report, such a claim also fails. Plaintiff does not demonstrate how the video and report transformed Plaintiff's workplace or resulted in unequal treatment. Accordingly, Defendants' motion is **GRANTED** as to Plaintiff's hostile environment claims.

## CONCLUSION

For the reasons set forth by the Court, Defendants' Motion for Summary Judgment is **GRANTED**.

**SO ORDERED.**

**Dated:** **March 30, 2020**
     **New York, New York**
                                           **ANDREW L. CARTER, JR.**
                                           **United States District Judge**